IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BUCKLE CORP. and GATEWAY INSURANCE COMPANY,<br><br>Plaintiffs,<br><br>v.<br><br>CHINA CONSTRUCTION BANK CORPORATION, CHINA CONSTRUCTION BANK NEW YORK BRANCH and CHINA CONSTRUCTION BANK (ASIA) CORPPORATION LIMITED,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Case No. |

**COMPLAINT**

**NATURE OF THE ACTION**

1. Plaintiffs Buckle Corp. ("Buckle") and Gateway Insurance Company ("Gateway," and together with Buckle, "Plaintiffs"), as and for their Complaint against defendants China Construction Bank Corp. ("CCBC"), China Construction Bank New York Branch ("CCBNY") and China Construction Bank (Asia) Corporation Limited ("CCBA"; collectively with CCBC and CCBNY, "CCB" or "Defendants"), allege based on personal knowledge of their own conduct and upon information and belief as to the conduct of others as follows:

2. This action arises from Defendants' refusal to honor nine clean, irrevocable, unconditional standby letters of credit (the "LOCs") with a combined face value of $9,799,895, issued by CCB in connection with United States reinsurance transactions. Gateway, Buckle's wholly-owned subsidiary, was the beneficiary of the LOCs, which were required by law and by contract to collateralize reinsurance obligations owed to Gateway. Upon Plaintiffs' inquiry, Defendants' counsel notified Plaintiff that Defendants had not issued the LOCs, asserting, after

the fact, that the LOCs were unauthorized. As a consequence, Plaintiffs had no security for their reinsurance, were deemed by regulators to have inadequate surplus and risk-based capital and as a result was placed into receivership, were precluded from engaging in new business, and were compelled by regulatory authorities to run-off all existing business.

3. CCBC, CCBNY, and CCBA are collectively referred to as "CCB" not merely for convenience, but because that is how they portray themselves to the public, regulators, and the market. In its regulatory filings with the Federal Reserve and the FDIC, CCBC describes itself and all of its branches and subsidiaries, including CCBNY and CCBA, as a single "universal bank." CCBC controls CCBA as its wholly owned subsidiary and operates in the United States exclusively through CCBNY, its sole American branch. CCBA, in turn, operates in the United States through CCBNY and maintains a correspondent account with CCBNY. CCBNY, although located in New York, does business that impacts other geographical areas, including Chicago, Illinois.

4. CCB is a willing participant in the U.S. financial and banking systems, and in particular, the U.S. reinsurance market. In furtherance of its expansion in the United States, CCBC applied for and was placed on the National Association of Insurance Commissioners' ("NAIC") prestigious list of "Qualified U.S. Financial Institutions" authorized to issue letters of credit as collateral for reinsurance transactions. CCBC knew that any reinsurers for whom it would issue letters of credit as security for reinsurance would be subject to the NAIC Credit For Reinsurance Model Law Section 2(H), which provides that any such reinsurer submits to the jurisdiction of any court of competent jurisdiction in the United States, and that CCBC as the provider of that security would likewise be subject to suit in any court of competent jurisdiction in the United States. CCBC further touted in its public filings that the issuance of letters of credit was one of its "core" business

practices, and it publicly represented that its employees and agents were authorized and qualified to engage in such business.

5. Plaintiffs entered into reinsurance arrangements in reliance on CCB's institutional representations, at the time of contracting, that CCBC was a NAIC-qualified, New York State Department of Financial Services-regulated, Federal Reserve-supervised financial institution with the authority, expertise, and security protocols to issue compliant letters of credit for reinsurance transactions in the United States. These representations were made directly by CCBC and CCBNY, through publicly available regulatory filings, annual reports, marketing materials, and CCB's NAIC qualification, and they induced Plaintiffs to accept CCB-issued LOCs as reinsurance collateral. Plaintiffs did not rely on any individual employee's authority. Rather, Plaintiffs relied on the institution - its regulated status, its public commitments, and its controlled corporate resources.

6. Each LOC bore the hallmarks of a genuine institutional product of CCB's banking operations: CCB's official letterhead, CCB's corporate seal (the traditional Chinese red-ink "chop," which is legally proper as the signature of a binding agreement under Chinese law and custom), CCB's SWIFT codes, CCB's internal reference numbering system, and CCBNY's New York address as the designated place of presentment and payment. At least some of the LOCs also bore Chinese characters above the authorized-signature line, consistent with Chinese banking practice.

7. CCB's disavowal of, and refusal to honor, the LOCs has caused catastrophic harm to Plaintiffs. The failure of the reinsurance collateralized by the LOCs resulted in Gateway having surplus less than the minimum required by law, causing the Illinois Department of Insurance to issue a "Notice of Impairment" that precluded Gateway from writing any new policies of

insurance, led to regulatory action compelling the cancellation, nonrenewal, or termination of existing policies, and resulted in regulatory authorities in multiple states suspending Plaintiffs' rights under various state licenses, which suspensions still persist today. Plaintiffs have suffered direct financial losses in the amount of the LOCs' face value, as well as massive consequential damages including reputational harm, loss of business, termination of business relationships, loss of business opportunities, and the potential for insolvency.

8. In a related action involving materially identical facts, Incline Casualty Co. et al. v. China Construction Bank Corp. et al., No. 24-cv-4392 (VM) (S.D.N.Y.), the Court dismissed the plaintiffs' claims without prejudice, identifying specific pleading deficiencies regarding agency, authority, and reliance. This Complaint is drafted to address and cure each of those deficiencies. Specifically, this Complaint pleads: (a) specific facts establishing CCBC's centralized operational control over the LOC issuance process across all CCB entities, including CCBA, such that CCBC—not merely CCBA—is directly liable; (b) Plaintiffs' contemporaneous reliance on CCBC's institutional representations - not on any individual employee's authority - at the time of contracting; (c) that CCBC is directly liable for the LOCs as institutional products of its banking operations, independent of any individual agent's authority; and (d) specific facts supporting each element of every cause of action asserted herein.

## PARTIES

9. Plaintiff Buckle Corp. ("Buckle"), is a corporation organized and existing under the laws of the state of Delaware with its principal place of business in Atlanta, Georgia. Buckle is the parent company of Gateway Insurance Company, an Illinois domiciled insurance company.

10. Plaintiff Gateway Insurance Company ("Gateway") is a property and casualty insurance company and a wholly-owned subsidiary of Buckle. Gateway is regulated by the Illinois

Department of Insurance ("IDOI"). Gateway was the direct beneficiary of the LOCs and was the cedent under the Reinsurance Contracts at issue.

11. Defendant CCBC is a Chinese bank headquartered at No. 25 Financial Street, Xicheng District, Beijing, People's Republic of China. CCBC is one of the four largest banks in the world by total assets. The government of China, through Central Huijin Investment Ltd., owns approximately 57% of CCBC's shares.

12. Defendant CCBNY is CCBC's New York branch, located at 1095 Avenue of the Americas, 33rd Floor, New York, New York 10036. CCBNY is CCBC's sole branch in the United States. CCBNY is not separately incorporated and has no legal identity separate from CCBC. See Bayerische Landesbank, N.Y. Branch v. Aladdin Cap. Mgmt. LLC, 692 F.3d 42, 51 (2d Cir. 2012). CCBNY is directly controlled and managed by the President of CCBC. CCBNY is licensed with and regulated by the New York State Department of Financial Services ("NYSDFS") and the Federal Reserve Bank of New York.

13. Defendant CCBA is a wholly-owned subsidiary of CCBC, headquartered at 28/F, CCB Tower, No. 3 Connaught Road, Central, Hong Kong, S.A.R., China. CCBNY maintains a correspondent account with CCBA. As alleged in detail below, CCBC exercises pervasive operational control over CCBA, including with respect to the LOC issuance process at the center of this dispute.

## JURISDICTION AND VENUE

### A. Subject Matter Jurisdiction

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and the action is between citizens of a state and citizens of a foreign state.

**B. Personal Jurisdiction over CCBC and CCBNY**

15.     The Court has personal jurisdiction over CCBC and CCBNY because CCBC has issued LOCs intended for the benefit of an Illinois-domiciled company, namely Gateway, and those LOCs state they will be honored upon presentment at CCBNY, which is the focal point of CCB's operations in the United States. CCBC (through CCBNY) is licensed with and regulated by NYSDFS and the Federal Reserve.

16.     CCBC is listed on the NAIC's list of "Qualified U.S. Financial Institutions" authorized to issue letters of credit as collateral in reinsurance arrangements. The purpose of such letters of credit is to secure performance of reinsurers in the state where the ceding insurer is located.  In this case, that state is Illinois, because Gateway is the ceding insurer.  CCBC knew that any reinsurers for whom it would issue letters of credit as security for reinsurance would be subject to the NAIC Credit For Reinsurance Model Law Section 2(H), which provides that any such reinsurer submits to the jurisdiction of any court of competent jurisdiction in the United States. CCBC, as the provider of the security necessary to the issuance of that reinsurance, likewise is subject to suit in any court of competent jurisdiction in the United States.

17.      This Court may exercise specific jurisdiction over CCBC and CCBNY pursuant to Fed. R. Civ. P. 4(k)(1)(A) and 735 ILCS 5/2-209(a)(1), (2), (4), and (7) and (c) because the causes of action arise from contracts and transactions of business, and commission of a tort, in or substantially connected with Illinois.  Additionally, CCBC and CCBNY are securing reinsurance that covers property and risks specifically operating and regulated under Illinois law and the authority of the Illinois Department of Insurance.  CCBC's obtaining placement of a location on the NAIC list constitutes a volitional transaction of business done for purposes of negotiating and

executing contracts related to LOCs in reinsurance transactions in the state of the cedent insurer, which in this case is Illinois because Gateway is the cedent insurer.

### C. Personal Jurisdiction over CCBA

18. CCBA committed tortious acts outside Illinois (negligent supervision of Lam in Hong Kong) that caused injury in Illinois. The first effect of CCBA's negligent supervision was felt when CCBNY's counsel informed Plaintiffs that the standby LOCs were not issued by the Shanghai affiliate of CCBNY. That Shanghai affiliate, CCBA, derives substantial revenue from international commerce and should reasonably have expected its tortious acts to have consequences in Illinois given that the LOCs expressly stated that they were for the benefit of Gateway, which is an Illinois domiciliary. Additionally, the LOCs were transmitted to Gateway in Illinois, Gateway relied on them in Illinois, and Gateway's damages occurred in Illinois. Thus, the fraud occurred in Illinois.

19. CCBA transacted business in Illinois through its agent Lam, who, at CCBA's direction and with CCBA's knowledge and consent, coordinated the issuance and delivery of LOCs that were payable to or for the benefit of Gateway for risks of loss that had to be paid from Gateway in Illinois and that would be used to enable Gateway to satisfy Illinois regulatory capital and surplus requirements. This Court also has personal jurisdiction over CCBA by virtue of the pervasive control over CCBA that is exercised by CCBC, as described in paragraphs 36-41 below, and by virtue of having personal jurisdiction over CCBC.

20. FSIA. Alternatively, this Court has personal jurisdiction over CCB pursuant to 28 U.S.C. §§ 1330, 1603 and 1605 because CCB is a majority-state-owned instrumentality and/or organ of the Chinese government and this action is based upon a commercial activity carried on in the United States. The government of China owns approximately 57% of CCB's shares through

Central Huijin Investment Ltd., directs appointment of senior positions within CCB, and, through the Communist Party of China, administers the bank's leadership.

21.     Venue is proper pursuant to 28 U.S.C. §§ 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District, in that Gateway maintains its principal place of business in this District, Gateway expected payment in this District for any reinsured losses it incurred, and Gateway learned in this District from CCBNY's attorney that **CCBA and CCBC disclaimed having issued the LOCs.**

## FACTUAL ALLEGATIONS

### A. The Reinsurance Structure

22.     Gateway is an insurance company regulated by the Illinois Department of Insurance. In the ordinary course of business, Gateway transfers (or "cedes") a portion of the insurance risks it underwrites to reinsurers, which assume those risks in exchange for a share of the premiums. The underlying policies include personal and commercial auto policies, on which Gateway receives and continues to receive and adjust claims and lawsuits.

23.     If a reinsurer is not licensed in the state where the cedent is domiciled, the reinsurer is legally and contractually required to collateralize its obligations to the cedent. A common and legally compliant form of collateral is a clean, irrevocable, unconditional standby letter of credit issued by a "Qualified U.S. Financial Institution" as determined by the Securities Valuation Office of the NAIC. If a cedent does not have compliant collateral, it must book an increase in liabilities equal to the uncollateralized reinsured obligations, sustaining a financial loss even before any claims are paid.

24.     The Corinthian Group ("Corinthian"), OspreyRe, and related entities (collectively, the "Transaction Entities"), in partnership with Vesttoo Ltd. ("Vesttoo"; together with the

Transaction Entities, the "Intermediaries"), created a reinsurance structure involving segregated account reinsurers, including Corinthian Re SPC, Osprey Re, and Coastal Insurance SPC (collectively, the "Corinthian Reinsurers"). This structure was developed in part through the Vesttoo platform and through meetings held at Vesttoo's offices in New York.

25.     The Transaction Entities solicited Plaintiffs to enter into reinsurance contracts (the "Reinsurance Contracts") with the Corinthian Reinsurers, which assumed risk from Gateway in exchange for reinsurance premiums. The Corinthian Reinsurers were not licensed in Gateway's domiciliary state and were thus required to collateralize their reinsurance obligations with compliant letters of credit issued by a NAIC-qualified financial institution.

26.     Corinthian obtained from CCB, through the Vesttoo platform, nine standby letters of credit naming Gateway as the beneficiary (the "LOCs"), with a combined face value of $9,799,895. These LOCs were required to collateralize the Corinthian Reinsurers' obligations to Gateway under the Reinsurance Contracts.

B. Plaintiffs' Reliance on CCB's Institutional Representations at the Time of Contracting

27.     At the time Plaintiffs entered into the Reinsurance Contracts and accepted the LOCs, Plaintiffs relied on multiple institutional representations made by CCBC and CCBNY to the public, regulators, and the insurance market. These included:

28. (a) NAIC Qualification. CCBC, through CCBNY, affirmatively applied for and obtained placement on the NAIC's list of "Qualified U.S. Financial Institutions." This qualification was a prerequisite to issuing LOCs as reinsurance collateral. By seeking this qualification, CCBC represented to the entire U.S. reinsurance industry—including Plaintiffs—that it possessed the institutional competence, financial stability, and security protocols necessary to issue compliant LOCs. Plaintiffs would not and could not have accepted the LOCs if CCBC were not on this list.

29. (b) Public Regulatory Filings. In its 2022 Reduced U.S. Resolution Plan Public Section Submission to the Federal Reserve and the FDIC, CCBC identified the issuance of "letters of credit" as one of its "core" business lines. Plaintiffs relied on these institutional representations at the time they accepted the LOCs.

30. (c) Anti-Fraud and Security Representations. In its annual reports, regulatory filings, and public-facing materials, CCBC represented that it maintained robust anti-fraud, anti-money laundering, and compliance systems. CCBC touted its "real time monitoring to detect fraud," "policies in place addressing fraud risk," and employees "trained to detect and report suspected fraudulent transactions." Plaintiffs relied on these representations in accepting the LOCs as collateral.

31. (d) "Universal Bank" Representation. CCBC described itself and its branches and subsidiaries as operating together as a "universal bank." Plaintiffs understood and relied on the fact that they were dealing with a single, integrated global banking institution.

C. The LOCs

32. Corinthian, acting through the Vesttoo platform and on behalf of the Corinthian Reinsurers, procured from CCB nine LOCs naming Gateway as the beneficiary. Each LOC provides that it is presentable and payable at CCBNY's New York office located at 1095 Avenue of the Americas, 33rd Floor, New York, NY 10036, and that CCB will promptly honor the beneficiary's sight drafts upon presentation at that location. Each LOC was subject to and governed by Article V of the Uniform Commercial Code.

33. The LOCs Are Institutional Documents. Each LOC bears the hallmarks of a genuine institutional product of CCB's banking operations: (a) CCB's official letterhead, bearing CCB's logo; (b) CCB's official corporate seal—the traditional Chinese red-ink "chop"—which is

legally proper as the signature of a binding agreement under Chinese law and banking custom; (c) Chinese characters appearing above the authorized-signature line, consistent with Chinese banking practice for authorized signatories; (d) CCB's SWIFT codes; (e) a reference number using CCB's internal numbering system (each beginning with "CCB"); and (f) CCBNY's New York address as the place of presentment and payment.

34. The LOCs were transmitted to Corinthian and subsequently delivered to Gateway in electronic form. Gateway relied upon the LOCs, listed them as assets and surplus receivables on its financial statements, and accounted for the LOCs in reporting to insurance regulatory authorities, including in calculating Gateway's satisfaction of statutory minimum Risk-Based Capital requirements. Gateway used the LOCs as collateral to satisfy Gateway's obligations under applicable insurance regulations.

35. CCB delivered each LOC with the full knowledge and deliberate intent that such LOC would be delivered to and relied upon by Gateway, as the named beneficiary.

**D. CCBC's Centralized Control Over the LOC Issuance Process**

36. The Multi-Office LOC Pipeline. The LOC issuance process was not the act of a single individual. As described by Lam himself to the Intermediaries during meetings at CCBA's Hong Kong office, the LOC issuance process required the coordinated involvement of multiple CCB teams across at least four offices: (a) CCB's "Credit Committee" located in Shanghai, which was responsible for initial credit approval; (b) a team in CCB's Beijing headquarters responsible for final approval of LOCs; (c) a team at CCBA in Hong Kong, where Lam was based as Relationship Manager; and (d) a team at CCBNY in New York responsible for confirming LOCs issued in connection with U.S. reinsurance transactions. This multi-office, multi-approval process

is inconsistent with the theory that a single rogue employee could have independently issued billions of dollars in LOCs without institutional knowledge.

37.     CCBC's Control Over Institutional Resources. The LOCs were produced using CCBC's institutional resources that no individual employee could have accessed without CCBC's knowledge and authorization: (a) CCBC's official letterheads; (b) CCBC's corporate seals (the red-ink "chops"), which under Chinese banking regulation and CCBC's own internal policies are maintained under strict custodial controls; (c) CCBC's SWIFT codes, which are proprietary identifiers not accessible to individual employees without institutional authorization; and (d) CCBC's internal LOC reference numbering system. The traditional Chinese "chop" seal, which appeared on each of the LOCs, is a controlled corporate asset in the Chinese banking system, maintained with security comparable to a Western corporate secretary's seal. The fact that each LOC bore this institutional seal demonstrates CCBC's institutional involvement and oversight of CCBA's LOC business.

38.     CCBC's Control Over CCBA and Lam. CCBC exercised pervasive operational control over CCBA and its employees, including Chun-Yin Lam ("Lam"), with respect to the LOC issuance process. Specifically: (a) CCBA's Chairman simultaneously serves as an Executive Vice President of CCBC; (b) CCBA's website states that CCBA is "fully supported" by CCBC in providing various services, implying that CCBC provides financial support or resources to CCBA on which CCBA depends to provide "synergistic businesses" that further the overall business of CCBC; (c) CCBC files consolidated financial and regulatory reports incorporating CCBA's operations; (d) CCBC's 2022 U.S. Resolution Plan describes CCBC as "the ultimate parent company of all subsidiaries" and the entire enterprise as a "universal bank"; (e) the "ccb.com" domain—including the "asia.ccb.com" subdomain used by Lam—is registered to, owned, and

maintained by CCBC; and (f) Lam used, and was required by CCBC to use, CCBC-branded letterheads, seals, SWIFT codes, and form documents—all controlled corporate assets of CCBC—in issuing and confirming the LOCs.

39.     Official Government Records Confirm Lam's Employment at CCB. Lam's status as an authentic CCB employee is confirmed by official government records. The Hong Kong Monetary Authority ("HKMA"), Hong Kong's central banking institution, maintains a public register of current and former staff of authorized institutions engaging in regulated activities. The HKMA register identifies "Lam, Chun Yin" (Chinese name: 林俊賢; HKMA Registration Number AI7485) as registered at "China Construction Bank (Asia) Corporation Limited" from August 24, 2021 through July 26, 2023, and authorized by the HKMA to deal in securities (Type 1) and to advise on securities (Type 4) during that period. Lam's HKMA-registered tenure precisely tracks the timeline of the LOC scheme, and his apparent termination on July 26, 2023 coincides with CCB's public assertions that the LOCs were fraudulent. In recent court filings in this District, CCB has not denied that Lam was, in fact, a bank employee during the relevant period.

40.     CCB Promoted Lam During the Fraud. Based on Lam's email signatures and communications with White Rock Insurance (SAC) Ltd., its auditors, and the Intermediaries, Lam was promoted by CCB from "Assistant Relationship Manager" in 2022 to "Relationship Manager" in 2023. CCB's decision to promote Lam was made during the same period in which Lam was actively issuing and confirming LOCs on CCB's behalf. Lam's promotion is inconsistent with CCB's contention that Lam was a rogue actor operating outside the scope of his employment and without institutional knowledge. To the contrary, CCB was actively managing Lam's career, evaluating his performance, and elevating his responsibilities at the very time he was issuing the LOCs at the center of this dispute. CCB's promotion of Lam further demonstrates that CCB was

either aware of and endorsed Lam's LOC-related activities, or was so grossly negligent in supervising him that it promoted an employee engaged in billions of dollars of unauthorized transactions without detecting any irregularity.

41. CCB Admits It Has No Dedicated Fraud Prevention Team. In a Wolfsberg Group Correspondent Banking Due Diligence Questionnaire ("CBDDQ") signed by senior CCB officers on May 10, 2023—just weeks before the fraud was publicly exposed—CCBNY represented that it has "policies in place addressing fraud risk" and "real time monitoring to detect fraud," and that "staff are trained to detect and report suspected fraudulent transactions, to Compliance for further review." However, in the same questionnaire, CCB admitted that it has no "dedicated team responsible for preventing & detecting fraud." This admission is devastating to CCB's claim that it was an unwitting victim of a rogue employee. CCB publicly held itself out to the reinsurance industry as maintaining robust fraud prevention capabilities, while simultaneously lacking even a dedicated team to carry out that function. Plaintiffs relied on CCB's public representations regarding its fraud prevention capabilities at the time they accepted the LOCs as collateral.

42. CCBNY's Specific Role. CCBNY was not a passive bystander. CCBNY was responsible for confirming LOCs issued in connection with U.S. reinsurance transactions, including the LOCs at issue. The LOCs were made payable at CCBNY's New York office. CCBNY's NAIC-qualified status was the essential predicate for the entire LOC program.

### E. Due Diligence and Third-Party Verification

43. As part of its due diligence (which Plaintiffs also relied upon), Corinthian: (a) ran CCB through global anti-money laundering ("AML") checks, which confirmed CCB's rating and raised no flags; (b) communicated directly with CCB personnel, including Lam and other managers who had legitimate CCB credentials, email domains, and authentic CCB telephone

numbers; (c) obtained from CCB personnel confirmation of the LOCs' issuance and cancellation instructions; and (d) retained and relied upon independent auditors, including Baker Tilly and Cherry Bekaert LLP, to confirm the authenticity of the LOCs.

44. Lam, acting on behalf of CCB and using CCB's email domain and credentials (chun-yin.lam@asia.ccb.com), repeatedly confirmed the LOCs at issue, including by emails dated June 7, 2022; May 8, 2023; May 22, 2023; and June 12, 2023. On May 22, 2023, Lam provided a counter-signed confirmation letter bearing his signature on behalf of CCB. These confirmations were not the unauthorized acts of a rogue employee—they were conducted using CCB's institutional email domain and resources over a period of more than a year.

**F. CCB's Knowledge and Failure to Act**

45. The April 2022 Notice. In April 2022, Old American County Mutual Insurance Company (NAIC No. 11665) and its auditor, Deloitte, contacted CCBNY and CCBA by email regarding similar letters of credit payable at CCBNY that had been procured by Lam. On April 6, 2022, CCBNY responded:

> All the four LCs were issued by another China Construction Bank branch (as shown in the LC copies below) rather than our New York Branch. Therefore, we are not entitled to perform audit confirmation on their behalf. Please reach out to the LC issuing bank directly for your audit confirmation.

46. This email is significant for three reasons. First, it demonstrates that CCBNY had actual notice, as of April 2022, that LOCs bearing CCB's name and payable at CCBNY were circulating in the U.S. reinsurance market. Second, rather than denying the LOCs' existence or flagging them as potentially fraudulent, CCBNY acknowledged that they were "issued by another China Construction Bank branch"—thereby confirming that the LOCs were institutional products of the CCB enterprise and reflecting that CCBA was treated as just another part of CCBC, not a

separate corporation. Third, CCBNY took no steps to investigate, flag, or prevent the continued issuance of additional LOCs.

47. Post-April 2022 LOC Issuance and Additional Detrimental Reliance. Multiple LOCs issued to Plaintiffs post-date April 2022. After CCBNY received the Old American County Mutual inquiry and acknowledged the existence of CCB-branded LOCs payable at its office, CCB continued to issue and confirm additional LOCs through Lam. CCB, through Lam, issued LOCs for the benefit of Gateway on December 22, 2022, January 16, 2023, and February 23, 2023. Lam confirmed LOCs by email on June 7, 2022; May 8, 2023; May 22, 2023; and June 12, 2023 — all after CCBNY was on actual notice. Plaintiffs accepted, maintained, and continued to rely upon these post-April 2022 LOCs in detrimental reliance on CCB's continued course of conduct, including CCBNY's failure to disavow, flag, investigate, or prevent the continued circulation of CCB-branded LOCs payable at CCBNY after receiving the April 2022 inquiry.

48. The April 2022 notice allegations provide an additional, independent basis for liability; they do not limit Plaintiffs' claims or damages to post-April 2022 LOCs. Plaintiffs seek recovery for all nine LOCs, including LOCs issued before and after April 2022. As to all nine LOCs, Plaintiffs allege that the LOCs are valid and enforceable institutional products of CCB's banking operations, or alternatively that they bind Defendants under principles of actual authority, apparent authority, respondeat superior, negligent supervision, estoppel, and the Uniform Commercial Code. The April 2022 notice allegations further establish that, no later than April 2022, CCBNY and the CCB enterprise had actual notice that CCB-branded LOCs payable at CCBNY were circulating in the U.S. reinsurance market and nevertheless failed to act. Had CCB disclosed in April 2022 that the LOCs were unauthorized, Plaintiffs would have terminated or restructured their reinsurance arrangements, demanded replacement collateral, avoided continued

reliance on CCB-branded LOCs, and mitigated their losses. Instead, Plaintiffs detrimentally changed and maintained their position by accepting and continuing to rely upon the LOCs, paying reinsurance premiums, maintaining their reinsurance arrangements, booking reinsurance credits on Gateway's financial statements, and treating the LOCs as valid collateral for regulatory and contractual purposes.

49.     Lam continued to interface with CCB's clients and to issue and confirm LOCs until CCB terminated his employment on or about July 26, 2023 - only after widespread media reporting. Lam's continued employment through July 2023, despite the April 2022 notice, is inconsistent with the theory that CCB was unaware of his activities.

50.     CCB's Chief Risk Officer Resigned Contemporaneously. In July 2023 - the same month the LOC fraud was publicly exposed, and Lam's employment was terminated - CCBC's Chief Risk Officer, Cheng Yuanguo, resigned his position, purportedly due to his age. The timing of this resignation—coinciding precisely with the public unraveling of a $2.81 billion fraudulent LOC scheme—is circumstantially significant and supports the inference that senior CCB management was aware of the scope and severity of the LOC-related misconduct.

51.     Lam Met with Intermediaries at CCB's Offices. According to the Vesttoo Bankruptcy Debtors' First Interim Report (the "Investigation Report"), Lam met with Vesttoo employees in person "at least twice at a CCB office in Hong Kong, which was the same office location listed in his email signature." The Investigation Report further concluded that Lam "communicated with Vesttoo from company emails and sent signed letters of credit that purported to be from" CCB, and that Lam "had numerous communications with Vesttoo employees concerning the LOCs—'issuing' (or at least sending) LOCs apparently signed by another employee of the bank, answering questions about LOCs, and sending confirmation of previously-

issued LOCs." The Investigation Report also found that Lam "communicated with auditors when they sought confirmation of CCB LOCs on behalf of third-parties." These findings confirm that Lam's LOC-related activities were conducted entirely under the auspices of CCB, using CCB's physical offices, email systems, and institutional resources, and that Lam's role extended to interfacing with external auditors—a function that would have been impossible without CCB's institutional infrastructure and implicit authorization.

### G. CCB's Dishonor of the LOCs

52.     In July 2023, based on widespread media reporting about issues with Vesttoo-related LOCs, Plaintiffs contacted the Intermediaries, who provided Lam's contact information: an email at the "asia.ccb.com" domain and an authentic CCB telephone number. Plaintiffs emailed Lam on July 18, 2023 seeking confirmation of the specific LOCs issued for Gateway's benefit, and the balances. Plaintiffs received no response, but the email did not bounce back, confirming that the email domain—owned and maintained by CCBC—remained active.

53.     On July 21, 2023, in response to Plaintiffs' e-mail, Sullivan & Cromwell ("S&C") sent a letter (the "S&C Letter") stating that CCBNY contacted its Shanghai affiliate and that affiliate had concluded it did not issue any of the LOCs. S&C further asserted that the LOCs bore "the absence of a signatory name and the use of an incorrect logo." Plaintiffs dispute these characterizations. The logo used on the LOCs is the correct logo for China Construction Bank, and the Chinese characters and "chop" appearing on the LOCs are legally proper under Chinese law and banking practice.

### H. Damages

54.     As a direct result of CCB's refusal to honor the LOCs, Plaintiffs have suffered and continue to suffer the following catastrophic harm:

55. (a) Direct Loss. Plaintiffs have suffered a direct loss in the amount of the face value of the nine LOCs issued for their benefit: $9,799,895.

56. (b) Negative Surplus and Regulatory Impairment. The failure of the reinsurance collateralized by the LOCs has resulted in Gateway's failure to satisfy the statutory surplus requirements to operate under the authority of its domiciliary state and maintain its licenses to maintain its programs and operations in other states.  Gateway had to disclose in a footnote to its second quarter 2023 Financial Report that the issuing bank was disavowing the LOCs.  By August, 2023, the Illinois Department of Insurance was addressing the situation.  On or about August 14, 2023, Buckle submitted a Plan of Action, and by the end of August 2023 General Counsel for Buckle and Gateway was reporting to the Illinois Department of Insurance weekly.  On June 13, 2024, the Circuit Court of Cook County, Illinois entered an agreed Order of Rehabilitation against Gateway and, among other things, the Rehabilitator was authorized to cancel all policies of insurance issued by Gateway then in-force without further order of the court. The Illinois Department of Insurance issued a "Notice of Impairment" precluding Gateway from writing any new policies of insurance. Gateway's claims under the underlying policies – personal and commercial auto policies - were supposed to be covered by the reinsurance structure collateralized by the LOCs. Because CCB refused to honor the LOCs, Gateway has been required to pay ongoing claims under these policies out of its own reserves, further eroding its surplus.

57. (c) Consequential Damages. Plaintiffs have suffered additional damages including: (i) loss of the ability to write new insurance business; (ii) reputational harm; (iii) termination of business relationships; (iv) loss of business opportunities; (v) the cost of purchasing alternative reinsurance; (vi) the cost of substantially increasing reserves; (vii) suspension of its state licenses;

(viii) failure to meet its debt obligations; (ix) approximately $3,300,000 in claims that should have been reimbursed by reinsurance; and (x) the potential for insolvency.

### I. Related Actions and the Scale of the Fraud

58. Multiple other insurance companies have commenced actions against CCB based on its failure to honor similar LOCs. These include: Incline Casualty Co. et al. v. China Construction Bank Corp. et al., 24-cv-4392 (S.D.N.Y.); Homeowners of America Insurance Co. et al. v. China Construction Bank Corp., No. 24-cv-3591 (S.D.N.Y.); White Rock Insurance (SAC) Ltd. et al. v. China Construction Bank Corp., Index No. 654432/2024 (N.Y. Sup. Ct.); and Clear Blue Insurance Co. et al. v. China Construction Bank Corp., No. 24-cv-09247 (VM) (S.D.N.Y.). The total value of LOCs that CCB has refused to honor is estimated at approximately $2.81 billion.

59. The Federal Bureau of Investigation and the Hong Kong Independent Commission Against Corruption ("ICAC") have commenced investigations into the fraudulent LOC scheme. The scope and duration of the scheme—spanning multiple years, involving multiple CCB offices, and resulting in billions of dollars in damages—is inconsistent with the actions of a single rogue employee.

60. Plaintiffs' claims are not limited to LOCs issued or confirmed after April 2022. Plaintiffs seek recovery for all nine LOCs. The pre-April 2022 LOCs are enforceable, or otherwise give rise to liability, because they were issued as institutional products of CCB's banking operations, bore the indicia of genuine CCB instruments, were made payable at CCBNY, and were accepted by Plaintiffs in reliance on CCB's institutional representations, NAIC qualification, regulatory status, security protocols, and controlled corporate resources. The post-April 2022 facts provide additional support for Plaintiffs' claims by showing that CCBNY and the CCB enterprise

had actual notice of CCB-branded LOCs circulating in the U.S. reinsurance market and failed to take corrective action.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### (Breach of Contract Against CCBC and CCBNY)

61. Plaintiffs repeat, reallege, and incorporate by reference all prior allegations.

62. Institutional Liability. Each LOC constitutes a valid and enforceable contract between CCBC (through CCBNY) and Gateway, as beneficiary. The LOCs are institutional products of CCBC's banking operations, bearing CCBC's letterhead, corporate chop seal, SWIFT code, and internal reference numbers. They were produced through a multi-office approval process involving CCB teams in Shanghai, Beijing, Hong Kong, and New York. As the institution whose name, seal, and controlled resources produced the LOCs, CCBC is directly liable.

63. Actual Authority. In the alternative, the LOCs are binding because Lam and other CCB employees had actual authority to bind CCBC/CCBNY. CCBC manifested intent to grant Lam authority by: (a) employing him as a Relationship Manager with a job description encompassing a "full range of banking and wealth management products and services"; (b) providing him with controlled institutional resources—letterheads, chop seals, SWIFT codes, email domains, and office facilities; (c) maintaining a multi-office LOC approval pipeline requiring coordination across Shanghai, Beijing, Hong Kong, and New York; and (d) operating centralized compliance and risk management systems that purportedly monitored employee activities across all branches and subsidiaries.

64. Apparent Authority. Further in the alternative, CCBC/CCBNY created the appearance of authority through their own conduct and Plaintiffs reasonably relied on that

appearance at the time of contracting. CCBC's NAIC qualification, regulatory filings, annual reports, and institutional branding all represented that CCB was a qualified issuer of LOCs. The LOCs themselves, bearing CCBC's institutional indicia, were the principal's manifestation of authority. Plaintiffs relied on these institutional manifestations—not on any knowledge of Lam's identity—when they accepted the LOCs.

65. Estoppel. CCBC/CCBNY are estopped from denying Lam's authority and from denying the validity and enforceability of the LOCs. As to all nine LOCs, Defendants clothed the LOCs with the indicia of genuine CCB institutional instruments, including CCB letterhead, CCB's corporate chop seal, CCB SWIFT codes, CCB internal reference numbers, and CCBNY's New York address as the place of presentment and payment. Plaintiffs reasonably relied on those institutional manifestations, as well as CCB's NAIC qualification, public regulatory filings, and representations concerning its authority and security protocols, in accepting and maintaining the LOCs as reinsurance collateral. In addition, as to LOCs issued, confirmed, maintained, or relied upon after April 2022, CCBNY had actual notice that CCB-branded LOCs payable at its office were circulating in the U.S. reinsurance market, acknowledged that such LOCs were issued by "another China Construction Bank branch," and failed to disavow, investigate, flag, or prevent the continued issuance and confirmation of additional CCB-branded LOCs. Plaintiffs relied to their detriment on CCB's institutional manifestations and continued course of conduct. The April 2022 notice allegations provide an additional basis for estoppel and liability and do not limit Plaintiffs' claims or damages arising from Defendants' refusal to honor all nine LOCs.

66. Plaintiffs complied with the terms of the LOCs until CCBNY's counsel informed Plaintiffs that the standby LOCs were not issued by the Shanghai affiliate of CCBNY, the upshot of which was that CCBC/CCBNY would not honor them. Defendants' refusal to honor the LOCs

caused Plaintiffs damages in an amount to be determined at trial, but not less than the face value of all nine LOCs, $9,799,895, plus consequential damages as described above.

## SECOND CAUSE OF ACTION

### (Breach of Contract Against CCBA)

67. Plaintiffs repeat, reallege, and incorporate by reference all prior allegations.

68. To the extent LOCs were issued by or through CCBA, CCBA's employee Lam delivered and confirmed them. CCBA made the LOCs payable at its affiliate CCBNY's New York office. CCBNY's counsel's informing Plaintiffs that the LOCs were not issued by the Shanghai affiliate of CCBNY, the consequence of which was that CCBA would not honor them, which constitutes a breach of the LOCs. Plaintiffs have been damaged as described above.

## THIRD CAUSE OF ACTION

### (In the Alternative: Fraud Against CCBC)

69. Plaintiffs repeat, reallege, and incorporate by reference all prior allegations.

70. To the extent that the LOCs are not valid and enforceable contracts because the Court determines they were not duly authorized, Plaintiffs assert this claim for fraud in the alternative. Because Defendants dispute the validity of the LOCs, a valid contract may not exist, and this claim is properly pled in the alternative.

71. Respondeat Superior. CCBC, acting through Lam and other authorized employees, made affirmative material misrepresentations to the Intermediaries and Plaintiffs, including the issuance and delivery of LOCs bearing CCBC's letterhead, chop seal, and SWIFT codes. Lam's conduct was committed within the scope of his employment, using CCB's offices, email systems, and institutional resources. The multi-branch process for issuing LOCs, including "final approval" from CCBC's Beijing headquarters, demonstrates that CCBC controlled the means and process by

which Lam issued the LOCs. CCBC exercised control over Lam through its enterprise-wide systems, its supervision of the LOC approval process, its ownership of the email domain and institutional resources used by Lam, and its pervasive managerial control over CCBA, where Lam was employed. Under the doctrine of respondeat superior, CCBC is vicariously liable.

72.     Plaintiffs reasonably relied upon the LOCs and upon CCBC's public representations regarding its authority to issue LOCs and its security protocols. Plaintiffs were damaged as a direct and proximate result.

## FOURTH CAUSE OF ACTION

### (In the Alternative: Fraud Against CCBA)

73.     Plaintiffs repeat, reallege, and incorporate by reference all prior allegations.

74.     CCBA, acting through its employee Lam, orchestrated a scheme to deceive Plaintiffs by delivering LOCs that CCBA did not intend to honor. Lam was an employee of CCBA, used CCBA's offices, email, and resources, and acted within the scope of his employment. Under respondeat superior, CCBA is vicariously liable for Lam's conduct. Plaintiffs were damaged as a direct and proximate result.

## FIFTH CAUSE OF ACTION

### (In the Alternative: Negligent Supervision Against CCBC)

75.     Plaintiffs repeat, reallege, and incorporate by reference all prior allegations.

76.     At all relevant times, Lam was an employee of CCBC or an affiliate under CCBC's direct control. This is demonstrated by the multi-branch approval process for LOC issuance directed by CCBC's headquarters, including "final approval" from Beijing, which establishes CCBC's control over the LOC issuance process and over the employees who participated in it. CCBC exercised control over Lam through its enterprise-wide systems, supervision of the LOC

approval process, and ability to monitor Lam's use of CCBC's email systems, letterheads, chop seals, and SWIFT codes.

77.     CCBC knew or should have known about Lam's conduct, given: (a) CCBNY's actual notice in April 2022; (b) the scope of the LOC issuance totaling approximately $2.81 billion; (c) CCBC's touted "seamless integration" of its banking systems and "real time monitoring to detect fraud"; (d) the involvement of multiple teams across four offices; (e) CCB's promotion of Lam from Assistant Relationship Manager to Relationship Manager during the very period in which he was issuing the LOCs; and (f) CCB's own admission, in a Wolfsberg CBDDQ signed by senior officers on May 10, 2023, that CCB has no "dedicated team responsible for preventing & detecting fraud." In Illinois, though, the law does not "require that the supervisor have prior notice of a particular unfitness because reasonable performance of the duty to supervise will put the supervisor on notice of an employee's conduct or perhaps prevent the employee's tortious conduct all together. Rather…to impose a duty to supervise, only general foreseeability is required in an employment context." Doe v. Coe, 434 Ill. Dec. 117, 132, 135 N.E.3d 1. Lam was at all times an employee of CCB, as confirmed by official HKMA records, in that he was employed by CCBA (a wholly owned subsidiary under CCBC's pervasive control), promoted by CCB during the fraud, and his tortious conduct was committed using CCBC's premises and chattels, including its offices, email systems, letterheads, chop seals, and SWIFT codes. CCBC had actual notice of Lam's LOC-related activities no later than April 2022, when CCBNY received and responded to the Old American County Mutual inquiry, and yet took no corrective action for over fifteen months, during the entirety of which it was foreseeable that Lam would issue additional LOCs. Lam's tortious conduct was committed using CCBC's chattels. CCBC negligently and carelessly oversaw and

supervised the work and activity of Lam, resulting in his tortious conduct. Plaintiffs were damaged as a direct and proximate result.

## SIXTH CAUSE OF ACTION

### (In the Alternative: Negligent Supervision Against CCBA)

78.     Plaintiffs repeat, reallege, and incorporate by reference all prior allegations.

79.     At all relevant times, Lam was an employee of CCBA. CCBA knew or should have known about Lam's conduct, including by reason of the April 2022 emails from Old American County Mutual's auditor to CCBA. CCBA negligently failed to properly supervise Lam. Plaintiffs were damaged as a direct and proximate result.

## SEVENTH CAUSE OF ACTION

### (Violation of UCC §§ 5-108 and 5-109 Against CCBC and CCBNY)

80.     Plaintiffs repeat, reallege, and incorporate by reference all prior allegations.

81. 810 I.L.C.S 5/5-102(a)(10), part of Illinois' adoption of the Uniform Commercial Code, defines a "letter of credit" as a "definite undertaking … by an issuer to a beneficiary … to honor a documentary presentation by payment or delivery of an item of value." Each LOC constitutes a "definite undertaking" by CCBC, as an institution, because each LOC was produced using CCBC's controlled institutional resources and bore all indicia of a genuine CCB instrument. Under 810 I.L.C.S 5/5-108, an issuer shall honor a presentation that appears on its face to comply with the terms of the letter of credit. Plaintiffs' presentations, if not prevented by the disavowal of the LOCs, would have complied with the express terms of the LOCs. CCBC's disavowal of the issuance of the LOCs constitutes an anticipatory refusal to honor the LOCs, in violation of 810 I.L.C.S 5/5-108.

82.     810 I.L.C.S 5/5-109 provides that even if a required document is forged or materially fraudulent, the issuer shall honor the presentation if demanded by a beneficiary who gave value in good faith and without notice of forgery. Plaintiffs gave value, would have presented in good faith but for CCBC's disavowal of the issuance of the LOCs, and were unaware of any purported fraud. CCBC's refusal violates 810 I.L.C.S 5/5-109.

83.     Because CCBNY is not separately incorporated and has no legal identity separate from CCBC, CCBNY is directly bound by the UCC obligations of CCBC with respect to LOCs payable at CCBNY. Plaintiffs are entitled to attorneys' fees, costs, and incidental damages pursuant to 810 I.L.C.S 5/5-111.

## EIGHTH CAUSE OF ACTION

### (Declaratory Judgment Against CCBC)

84.     Plaintiffs repeat, reallege, and incorporate by reference all prior allegations.

85.     An actual and justiciable controversy exists between Plaintiffs and CCBC regarding: (a) the validity and enforceability of the LOCs; (b) CCBC's obligation to honor Plaintiffs' sight drafts; and (c) whether Lam and other CCB employees had authority to bind CCBC.

86.     Declaratory relief is appropriate and not duplicative of Plaintiffs' legal claims because the resolution of these issues will affect the parties' ongoing obligations. The LOCs are evergreen instruments creating continuing obligations. A declaration regarding CCBC's obligations will provide clarity regarding the parties' rights with respect to Plaintiffs' reinsurance arrangements and Gateway's regulatory status.

87. In the event the LOCs cannot be honored in their current form, Plaintiffs seek a declaration that CCBC is obligated to provide valid replacement letters of credit retroactively collateralizing the reinsurance obligations.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor against Defendants as follows:

(a) On the First Cause of Action, a money judgment against CCBC and CCBNY in an amount to be determined at trial, but not less than the face value of all nine LOCs, $9,799,895, plus $3,300,000 in claims that should have been reimbursed by reinsurance, together with consequential damages, interest, costs, and attorneys' fees;

(b) On the Second Cause of Action, a money judgment against CCBA in an amount to be determined at trial, together with interest, costs, and attorneys' fees;

(c) On the Third Cause of Action, in the alternative, a money judgment against CCBC in an amount to be determined at trial, together with punitive and/or exemplary damages, interest, costs, and attorneys' fees;

(d) On the Fourth Cause of Action, in the alternative, a money judgment against CCBA in an amount to be determined at trial, together with punitive and/or exemplary damages, interest, costs, and attorneys' fees;

(e) On the Fifth Cause of Action, in the alternative, a money judgment against CCBC in an amount to be determined at trial, together with interest, costs, and attorneys' fees;

(f) On the Sixth Cause of Action, in the alternative, a money judgment against CCBA in an amount to be determined at trial, together with interest, costs, and attorneys' fees;

(g)     On the Seventh Cause of Action, a money judgment against CCBC and CCBNY in an amount to be determined at trial, together with attorneys' fees, costs, and incidental damages pursuant to 810 I.L.C.S 5/5-111;

(h)     On the Eighth Cause of Action, a declaratory judgment that (i) the LOCs are valid and enforceable and CCBC is obligated to honor Plaintiffs' sight drafts, or in the alternative, (ii) CCBC is obligated to provide valid replacement letters of credit; and

(i)     For such other legal, equitable, and further relief as this Court deems just and proper, including all costs and disbursements of this action.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully submitted

TRIBLER ORPETT & MEYER, P.C.

By:     s/Mitchell A. Orpett
        One of the Attorneys for Plaintiffs,
        BUCKLE CORP. and GATEWAY
        INSURANCE COMPANY

Mitchell A. Orpett, Esq.  ARDC # 3121966
Tribler Orpett & Meyer, P.C.
225 West Washington Street, Suite 2550
Chicago, Illinois 60606
(312) 201-6400
maorpett@tribler.com
docket@tribler.com